UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

REALTYLINK LLC, et al.,          )
                                    )
          Plaintiffs,       )
                                    )
          v.                )     No. 1:24-cv-00989-SEB-TAB
                                    )
CITY OF LEBANON, et al.,     )
                                    )
          Defendants.     )

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

This cause is before the Court on Defendants' Motion to Dismiss [Dkt. 47]. Plaintiffs RealtyLink LLC ("RealtyLink") and In Lebanon John Shaw, LLC ("Shaw LLC") (collectively, "Plaintiffs") are seeking constitutional relief for their business investment losses, pursuant to 42 U.S.C. § 1983 allegedly caused by Defendants City of Lebanon (the "City"), Lebanon City Council ("City Council"), Lebanon Municipal Utilities ("City Utilities"), Matthew T. Gentry, in his individual capacity and official capacity as Mayor of the City of Lebanon, and Dick Robertson, John Copeland, Keith Campbell, Mike Kincaid, Robert Hawkins, Sandra Jasionowski, and Sierra Messenger, in their individual capacities and official capacities as a members of the Lebanon City Council.  Plaintiffs have sued Defendants, jointly and severally, for violations of their Fourteenth Amendment due process and equal protection rights in connection with a property development deal gone awry.  Plaintiffs also seek a declaratory judgment and assert claims of promissory estoppel, defamation, and constructive fraud based on Indiana state law.

1

State law may provide a more promising pathway to recovery for the damages Plaintiffs have suffered, but because Plaintiffs' allegations do not plausibly suggest that the Constitution supplies an effective legal basis for relief from their losses, as detailed below, Defendants' Motion to Dismiss [Dkt. 47] is <u>GRANTED</u> without prejudice.

## Factual Background

**Purchase of the Property**

RealtyLink is a private company that has developed over 600 projects throughout the country, including multi-family housing developments, entertainment venues, and industrial and manufacturing sites. Am. Compl. ¶¶ 17–18. In 2021, RealtyLink began exploring the possibility of developing a commercial and industrial park in the City of Lebanon, Indiana, eventually identifying a 119-acre property, near John Shaw Road and Tyre Road, that had been annexed by the City in 2007 (the "Property"). *Id.* ¶¶ 19–21. RealtyLink sought to build a development project to be known as the "Cedars of Lebanon" (the "Cedars") to be developed over several phases consisting of multiple industrial and manufacturing buildings designed for various purposes, including ambient storage and cold storage. *Id.* ¶ 22. RealtyLink expected the Cedars development to create jobs and bring other economic development benefits to the area. *Id.* ¶ 23.

As with other of its completed projects, RealtyLink required economic support from impacted local governments in order to make the Cedars project successful. *Id.* ¶ 24. RealtyLink therefore hoped to develop in a community that would extend to it economic development incentives, such as tax abatement, tax increment financing

2

("TIF"), and other incentives typically offered by local governments to attract development projects. *Id.* ¶ 25.

Upon learning of RealtyLink's interest in developing the Property, City officials and the Boone County Economic Development Corporation (the "Boone EDC") undertook communications with RealtyLink to encourage the development of property in the City.  City officials, including Mayor Matthew Gentry, discussed incentives the City could potentially provide to underwrite some of the cots of developing the Cedars, including a tax abatement, inclusion of the Cedars in an economic revitalization area ("ERA") created by the City for industrial uses, the creation of a TIF district for the Cedars, and the issuance of bonds (the "Bonds") to allow infrastructure to be developed in the Cedars area (collectively, the "Incentives").  *Id.* ¶¶ 27–32.  Plaintiffs allege that the Incentives were intended to function, not individually or in isolation, but as a single economic development package, and, if any one of the Incentives was dropped, the remaining Incentives would no longer be meaningful.  *Id.* ¶¶ 29–30.

The City was aware from its earliest communications with RealtyLink's representatives that the Cedars project would not be financially viable without the Incentives.  *Id.* ¶ 33.  From 2021 through 2023, City officials, including Mayor Gentry and attorneys representing the City and its Council, repeatedly conveyed the City's intention to provide the Incentives in an effort to induce RealtyLink to dedicate its own resources to the Cedars project.  *Id.* ¶¶ 34–36.  City officials, including Mayor Gentry, promised that the City would approve the Incentives and that they would remain in place for at least 25 years.  *Id.* ¶¶ 36, 38.  The City also represented that adequate water and

3

wastewater services would be provided, which was a similar promise to that made by the City to the previous owner of the Property. *Id.* ¶¶ 40–41. According to RealtyLink, these representations were not conditional offers, they were promises made with the expectation that RealtyLink would rely on them so as to induce RealtyLink to pursue the Cedars project. *Id.* ¶¶ 37, 39.

Relying on the City's representations, Plaintiffs negotiated a purchase price of $6,786,000 for the entirety of the Cedars property, which included an initial purchase for Phase One of the project and an option to buy at a favorable price additional property for Phase Two of the project.[1] *Id.* ¶¶ 42–43. RealtyLink created Shaw LLC to hold title in the Cedars real estate and Shaw LLC thus became the purchaser of the real property for the Cedars project. *Id.* ¶ 48. Shaw LLC closed on the initial purchase of a portion of the Property on July 7, 2022, and its deed was recorded that same day. *Id.* ¶ 49. Plaintiffs obtained $3.3 million in financing in order to complete the initial purchase, which sum with returns and interest has since grown to $4 million. *Id.* ¶ 51.

**Water and Wastewater Service for the Cedars Project**

Following its initial communications with the City and prior to purchasing the Property, RealtyLink began development efforts in July 2021, which included arranging surveys, marketing, preparing reports, hiring consultants, and submitting applications for various permits, the costs of which ran into the tens of thousands of dollars. *Id.* ¶¶ 53–54.

---

[1] Public property records, of which we take judicial notice, show that Shaw LLC purchased 42.69 acres of the Property and recorded an option to purchase the remaining 73.94 acres. *See* Dkt. 17-1 at 2–9, 35–51. Plaintiffs allowed the option to expire on June 8, 2024, two days before filing the instant lawsuit.

One of the initial challenges that required a resolution before construction of the Cedars could begin was the lack of water or wastewaters services at the Property. The City holds the exclusive right to provide water and wastewater services to residents and businesses within the City's borders. *Id.* ¶¶ 108–09. However, the City and City Utilities lacked any connection point near the Property and the necessary facilities required for RealtyLink to connect to the City Utilities system. *Id.* ¶ 57. The City directed RealtyLink to attempt to obtain easements from a neighboring property owner so that the City and City Utilities could install pipes and other necessary infrastructure to connect the Cedars to City Utilities's existing wastewater system, but the neighboring property owner refused to grant the requested easements. *Id.* ¶¶ 58–59.

After additional discussions with the City and City Utilities, RealtyLink placed a future "connection point" on the Property where the City could eventually provide wastewater services. Although RealtyLink placed this "connection point" at the specific location designated by the City and City Utilities, throughout 2022 and 2023, the City never succeeded in making water available to the Property, forcing RealtyLink to seek alternatives for obtaining the necessary water and wastewater services. *Id.* ¶¶ 60–62.

In the fall of 2022, in an effort to move the Cedars project forward, RealtyLink sought approval from the City to provide water service to the Property through the "pump-and-haul" method, which would have entailed RealtyLink's bringing water to the site and taking the wastewater away to be treated. *Id.* ¶¶ 63–64. The City approved of this approach and recommended that RealtyLink obtain the required pump-and-haul permit from the Indiana Department of Environmental Management ("IDEM") to permit

5

RealtyLink to remove its own wastewater until such point as the City could provide adequate wastewater services to the Property. *Id.* ¶¶ 65–66.

RealtyLink submitted its permit application in April 2023, which was approved by IDEM in May 2023. *Id.* ¶¶ 68–69. The pump-and-haul permit authorized RealtyLink to pump-and-haul for at least two years, which authorization could be extended until the time sewer services were made available by City Utilities. *Id.* ¶ 70. Throughout this period, the City's representatives represented to RealtyLink that it had met all the pre-conditions to construction; to that effect, an April 13, 2023 email communication from a City engineer provided: "I believe all approvals are in order on our end, if you are ready to move this project forward, please work with Kristi Spencer (cc'd) to see that all appropriate fees and permit applications are finalized and schedule a preconstruction meeting." *Id.* ¶¶ 71–73; Exh. 1.

By August 2023, the City had changed its position, informing RealtyLink that it was not authorized to operate under the pump-and-haul permit, and threatening to sue RealtyLink if it accepted the IDEM permit. *Id.* ¶¶ 78–81. The attorney for City Utilities repeated this litigation threat on November 14, 2023. *Id.* From that point forward, progress on the Cedars project was stalled by the City's claim that RealtyLink could not pump-and-haul under the IDEM permit unless RealtyLink submitted engineering drawings depicting how the Cedars would be connected to City Utilities's sewer system if the easements were not granted. *Id.* ¶ 82. Plaintiffs allege that, because the easements were not disclosed to them, they had no way of knowing how the Cedars would connect to the City Utilities's system. *Id.* ¶¶ 83–84. These issues with utilities delayed

6

RealtyLink's closing on bank financing and TIF bond financing before the end of 2023, which in turn delayed the Cedars project from commencing construction in the spring of 2024 as planned. *Id.* ¶¶ 86–87.

**The LEAP District**

In July 2022, the City Council approved a large commercial development in the City known as "Limitless Exploration/Advanced Pace" ("LEAP"). LEAP is an area comprised of up to 10,000 acres and identified as such with the intent of attracting various industrial, commercial, and technology facilities, including manufacturers of aerospace parts, electric motor vehicles, medical diagnostic laboratories, semiconductors, and other high-tech equipment such as microchips. *Id.* ¶¶ 111, 115. These industries, particularly microchip and semiconductor facilities, require massive quantities of water that far exceed what is normally required to support typical residential, commercial, and industrial land uses. *Id.* ¶¶ 115–116. Following RealtyLink's purchase of the Property and its initial development of the Cedars, the City began annexing much of the LEAP district to allow the LEAP territory to be within the City's borders. *Id.* ¶¶ 113–114.

Plaintiffs allege that, despite knowing that the City faced the possibility of insufficient water to service the Property due to the widely known groundwater shortage in the Lebanon area, Defendants nonetheless offered the Incentives to RealtyLink to develop the Cedars and thereafter approved the LEAP district knowing that vast quantities of already scarce water would be required to serve the LEAP project. *Id.* ¶¶ 117–121. This problem of the shortage of water for business development has led the City, City Utilities, and other entities to explore options for obtaining various sources of

7

water, including through the installation of pipes and infrastructure capable of transporting up to 100 million gallons of water a day from the Wabash River and connected aquifers in Tippecanoe County that would cross the state to reach Lebanon. *Id.* ¶¶ 122–124.

**City Ordinances**

Undeterred by the ongoing dispute over the utility connection for the Cedars project, in 2023 the City began the process of enacting the various ordinances required to deliver on the Incentives. On August 14, 2023, the Lebanon Redevelopment Commission approved a resolution that included the Cedars in an economic redevelopment area, which would allow RealtyLink to seek tax abatements for the Cedars. *Id.* ¶ 90. In compliance with Indiana statutes, the City Council also passed both the declaratory and confirmatory resolutions required to authorize the Incentives, unanimously approving both the initial "declaratory resolution" and the subsequent "confirmatory resolution," styled as "Ordinance 2023-22" (the "Authorizing Ordinance"), on August 28, 2023 and November 12, 2023, respectively. *Id.* ¶¶ 92–93.

Recognizing that the Cedars project promised economic benefit to the City, the Authorizing Ordinance approved the proposed financing for the Cedars project, including the issuance of bonds, and directed the Mayor and Clerk-Treasurer to take the necessary actions to close the deal. *Id.* ¶¶ 95–98; Exh. 3. The Authorizing Ordinance contained no deadline for the issuance of the Incentives. Thus, when RealtyLink representatives shared at the City Council meeting that construction on the Cedars project would begin in spring of 2024, neither Mayor Gentry nor any other member of the Council responded,

8

suggesting that timeframe was too late or conflicted with any construction deadline that RealtyLink was obligated to meet to prevent the City from withdrawing the Incentives. Indeed, at no time between 2022 and 2024 did any City official or representative, when discussing the Cedars project, indicate that any such deadline existed. *Id.* ¶¶ 99–107.

**The City Revokes the Incentives**

Following passage of the Authorizing Ordinance by the Council, RealtyLink continued its efforts to resolve the wastewater connection issue, which was the single remaining problem that the City and City Utilities claimed was holding up development. On March 21, 2024, after a period of negotiations, RealtyLink was finally able to obtain the necessary easements connecting them with City Utilities's wastewater system. That same day, at 4:33 p.m., RealtyLink sent an email to the City's engineer, Kevin Krulik, informing him that it had obtained the required easements and inquiring whether any further steps were required to establish the utility connection. Specifically, RealtyLink stated in that email:

> See attached the executed water easement with Kenneth Limp Farms, Inc. that allows us to construct the water main extension in compliance with the approved drawings mentioned below. I will be in town in a few weeks to pick up these permits and begin mobilization efforts. Can you please let us know the fees associated with these permits and any documentation you need to schedule the precon meeting[?]

*Id.* ¶¶ 146–48; Exh. 6.

The following day, on March 22, 2024, at 12:38 p.m., Mr. Krulik responded as follows:

> Please advise as to the status of the offsite sanitary sewer easement, as it relates to the current set of construction documents. Please provide said

sanitary sewer easement along with revised construction documents, and I will circulate the plans and associated easements to all parties in order to verify that all planning and technical issues have been properly resolved. Nothing further is needed at this time, please stand by for further direction.

Am. Compl. ¶ 149; Exh. 7. A few days thereafter, on March 25, 2024, RealtyLink provided the sewer easement to Mr. Krulik and repeated that its representatives would soon be in town to pick up their permit and begin construction. Am. Compl. ¶ 158; Exh. 11.

Unbeknownst to Plaintiffs, within hours of Mr. Kruik's transmittal of his March 22 response to RealtyLink, the Mayor's office issued an updated City Council agenda for distribution to City employees. Am. Compl. ¶ 151; Exh. 8. The updated agenda included, for the first time, the following: "Ordinance 2024-06: Repealing Ordinance 2023-22-Mayor Gentry." Am. Compl. ¶ 153; Exh. 9; Exh. 10. The City Council conducted its regularly scheduled meeting on March 25, 2024, (their sixth meeting of 2024), at which live testimony was presented on various agenda items, including an update on the various TIFs in place throughout the City, an update on the Hickory Junction Fieldhouse, and a change-order request for technology in the Council chambers. Am. Compl. ¶ 161; ¶ 167. At this point in the meeting, Mayor Gentry introduced a proposed ordinance, Ordinance 2024-06 (the "Repeal Ordinance"), the effect of which was a repeal of the Authorizing Ordinance. Unlike the other participants at the meeting who were given notice and an opportunity to present live testimony in support of their specific items of business with the City Council, RealtyLink received no prior notice of the Repeal Ordinance. *Id.* ¶¶ 163–64.

10

In describing the Repeal Ordinance, Mayor Gentry justified the decision to revoke the Incentives on the grounds that RealtyLink had failed to meet the December 31, 2023 deadline by which it was obligated to secure all necessary permits for the Cedars project and also due to the City's concerns regarding plans for allocating its limited water resources. *Id.* ¶¶ 166, 185. The December 31 deadline had not been included in the Authorizing Ordinance, nor was RealtyLink ever informed of, nor did it agree to such a deadline. *Id.* ¶¶ 171–173. At the conclusion of Mayor Gentry's explanation, the City Council suspended the rules and voted unanimously to approve the Repeal Ordinance, thereby withdrawing the Incentives. *Id.* ¶ 186.

RealtyLink's first notice of the repeal came more than a week later, on April 4, 2024, by letter from the City's counsel informing it that the City had accepted the current construction documents following RealtyLink's procurement of the easements, but that the City and City Utilities would nonetheless be unable to provide the Cedars project with water. In applicable part, the letter stated:

> However, the City may not be able to release for construction, process construction related permits, and [/] or accept associated development and construction fees as [City] Utilities has notified the City and the Developer of minimal allocatable water supply capacity, and depending on the users associated with the Cedars Project and the timing of permit issuance, existing available capacity may not be sufficient to supply the project, thereby allowing for release of construction.

*Id.* ¶ 190; Exh. 13 at 2. The City and the City Council had offered RealtyLink the Incentives despite their knowledge of the water shortage and the strong likelihood that water would not be available for the Cedars project. Am. Compl. ¶ 192.

11

The City's repeal of the Incentives caused RealtyLink to scuttle entirely the Cedars project, resulting in monetary damages to Plaintiffs in amounts exceeding $25M as well as reputational damage and increased difficulty in obtaining credit, all of which has imposed hardships on RealtyLink in securing other projects. *Id.* ¶¶ 197–198.

**The Instant Litigation**

Plaintiffs filed their original complaint on June 10, 2024, and the operative amended complaint on December 12, 2024, alleging violations of their Fourteenth Amendment due process and equal protection rights in connection with Defendants' repeal of the Incentives.  Their lawsuit seeks as well a declaratory judgment, and claims for promissory estoppel, defamation, and constructive fraud based on Indiana law. Defendants have moved to dismiss with prejudice Plaintiffs' complaint, which motion has now been fully briefed and is ripe for ruling.

**Legal Analysis**

I.  **Applicable Legal Standard**

Defendants' motion to dismiss is based on Federal Rule of Civil Procedure 12(b)(6).  In this procedural context, the Court accepts as true all well-pled factual allegations in the complaint and draws all ensuing inferences in favor of the non-movant. *Lake v. Neal*, 585 F.3d 1059, 1060 (7th Cir. 2009).  Nevertheless, the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," and its "[f]actual allegations must . . . raise a right to relief above the speculative level."  *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (citations omitted).  Thus the complaint must include "enough facts to state a claim to relief that is

12

plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see* Fed. R. Civ. P. 8(a)(2). Stated otherwise, a facially plausible complaint is one which permits "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.   Due Process Claim

Count I of the Amended Complaint alleges that Defendants deprived Plaintiffs of their Fourteenth Amendment procedural due process rights by failing to provide them notice and an opportunity to be heard prior to the revocation of the Incentives. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 333 (citation modified). To state a procedural due process claim, a plaintiff must plausibly allege "(1) deprivation of a protected interest, and (2) insufficient procedural protections surrounding that deprivation." *Michalowicz v. Vill. of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008) (citation omitted).

In determining whether a property interest exists, courts "look to an independent source, such as state law, rather than the U.S. Constitution itself." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 365 (7th Cir. 2019) (citation omitted). "A property interest for purposes of the Due Process Clause is created by existing rules or understandings that stem from an independent source such as state law—rules or

13

understandings that secure certain benefits and that support claims of entitlement to those benefits." *Kim Const. Co., Inc. v. Bd. of Trustees of Vill. of Mundelein*, 14 F.3d 1243, 1245–46 (7th Cir. 1994) (citation modified).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  In other words, "property is what is securely and durably yours under state … law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain." *Kim Const.*, 14 F.3d at 1246 (citation omitted). "Although we look to state law for the source of the plaintiff's alleged property interest, whether a particular state-created interest rises to the level of a 'legitimate claim of entitlement' is a question of federal law." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015) (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)).  "A protected property interest exists only when the state's discretion is 'clearly limited such that the plaintiff cannot be denied the interest unless specific conditions are met.'" *Booker-El v. Superintendent, Indiana State Prison*, 668 F.3d 896, 900 (7th Cir. 2012) (quoting *Brown v. City of Michigan City, Ind.*, 462 F.3d 720, 729 (7th Cir. 2006)).

Defendants seek dismissal of Count I on the grounds that Plaintiffs have failed to plausibly allege that they hold a cognizable property interest in either the Property or the Incentives, and, in any event, that the revocation of the Incentives was a legislative act for which Plaintiffs were entitled to no special notice or opportunity to be heard.  Plaintiffs rejoin that they have adequately alleged a property interest in both the Property, which

14

they purchased for the sole purpose of developing through the Incentives, as well as in the Incentives themselves, either under Indiana's vested rights doctrine or based on the parties' mutual understanding that the City would provide the Incentives. Plaintiffs argue that the City's revocation of the Incentives violated their procedural due process rights because the revocation was not a generally applicable legislative act, but rather specifically targeted at Plaintiffs, and thus, they were entitled to notice and an opportunity to be heard before the Authorizing Ordinance was repealed.

We turn first to address whether Plaintiffs have adequately alleged a cognizable property interest in either the Property or the Incentives.

### A.    Real Property Interest

Plaintiffs allege that the City's actions intruded on Plaintiffs' interest in their real property and the expenditures they made on that real property.[2] Specifically, Plaintiffs argue that they have a cognizable property interest in the Property which was "impaired" by the Repeal Ordinance, which "made development of the property impossible and denied RealtyLink the very purpose for which it purchased the property[.]" Resp. at 15. Although not specifically pled as such, this is essentially a Fifth Amendment regulatory takings claim, where Plaintiffs allege that "government regulation of private property [is]

---

[2] Plaintiffs argue that Defendants have waived their right to respond to Plaintiffs' allegations in the amended complaint that they have protectible property rights in the real property and in the Incentives under a vested rights theory because Defendants did not raise these arguments in their opening brief. However, Defendants argued in their opening brief that Plaintiffs' allegations fail to plausibly allege *any* protectible property right. In response, Plaintiffs argued that they had demonstrated property rights in both the real property and in the Incentives under a vested rights theory. Accordingly, Defendants were entitled to respond to those arguments in their reply.

15

so onerous that its effect is tantamount to a direct appropriation" under the Takings Clause. *Nowlin v. Pritzker*, 34 F.4th 629, 634 (7th Cir. 2022) (citation omitted). To properly state such a claim, Plaintiffs must plausibly allege that the City's actions in repealing the Incentives "deprived them of all or a significant part of the economically beneficial use of the property." *Id.* (citations omitted).

Here, Plaintiffs have failed to meet "the demanding test for alleging a regulatory taking." *Id.* Plaintiffs have alleged only that the City knew that they were purchasing the Property solely to develop it, and that Plaintiffs could develop the Property only with the help of the Incentives, such that when the City repealed the Incentives, Plaintiffs could no longer make use of the Property for the purpose for which it had been purchased. However, while Plaintiffs have alleged that the repeal of the Incentives deprived them of their preferred—and potentially most profitable—use of the Property, it does not automatically follow that the Property thereby lost all or a significant part of its economically beneficial use, nor do Plaintiffs allege sufficient facts to plausibly support such an inference. *See id.* at 635 ("[Plaintiffs] were free to make other uses of their properties consistent with the closure orders. … That such uses would not have been their preferred or most profitable uses does not mean that the closure orders effected a regulatory taking. This complaint fails to move the needle from the possible to the plausible with respect to the alleged Takings claim.").

### B.    Property Right in the Incentives

Plaintiffs also contend that they have adequately alleged a cognizable property right in the Incentives themselves, either pursuant to Indiana's vested rights doctrine or

based on the parties' mutual understanding that the City would provide the Incentives. We address these arguments in turn below.

### 1.  Vested Rights Doctrine

Citing *Metropolitan Development Commission of Marion County v. Pinnacle Media, LLC*, 836 N.E.2d 422 (Ind. 2005) (*Pinnacle I*), *aff'd on reh'g*, 846 N.E.2d 654 (Ind. 2006) (*Pinnacle II*), Plaintiffs argue that Indiana law protects developers from a local government's actions if the developer "relied in good faith upon some act or omission of the government" and "made substantial changes or otherwise committed itself to its 'substantial disadvantage' prior to the change."  Dkt. 49 at 17 (quoting *Pinnacle I* 836 N.E.2d at 425–26).  Plaintiffs contend that they have adequately alleged a protectible property interest in the Incentives under this doctrine as they have alleged sufficient facts from which it could plausibly be inferred that they reasonably relied on the City's repeated promises over a three-year period to provide the Incentives for the Cedars property, and that, prior to the City's revocation of the Incentives, Plaintiffs made "substantial changes" in reliance on the City's promise, including their purchase of the Cedars property and their securing more than $4 million in financing for the development, their engagement of engineers and architects for design of the facilities, their marketing of the project to potential tenants, their acquisition of the pump-and-haul permit, and their negotiations of the easements as the City demanded.

It matters that all the cases cited by Plaintiffs in support of their vested rights argument[3] involve zoning ordinances.  In fact, the entire passage in *Pinnacle I*, cited by Plaintiffs in support of their vested rights argument, states as follows: "[C]ourts have been willing to hold that the developer acquires a 'vested right' such that a new ordinance does not apply retroactively if, but only if, the developer '(1) relying in good faith, (2) upon some act or omission of the government, (3) … has made substantial changes or otherwise committed himself to his substantial disadvantage *prior to a zoning change*.'" *Pinnacle I*, 836 N.E.2d at 425–26 (quoting John J. Delaney and Emily J. Vaias*, Recognizing Vested Development Rights as Protected Property in Fifth Amendment Due Process and Takings Claims*, 49 Wash. U.J. Urb. & Contemp. L. 31–35 (1996)).  Neither party has cited, nor have we found, a case in which the vested rights doctrine as set forth in *Pinnacle I* has been applied outside the context of zoning ordinance/land use restrictions.  *See BBL, Inc. v. City of Angola*, No. 1:13-CV-76-RLM, 2014 WL 26093, at *29 (N.D. Ind. Jan. 2, 2014) ("The vested rights doctrine only applies to zoning ordinances….") (citing *Plaza Grp. Props., LLC v. Spencer Cnty. Plan Comm'n*, 877 N.E.2d 877, 884 (Ind. Ct. App. 2007) (quoting *Pinnacle I*, 836 N.E.2d at 425–26) ("The general rule is that nonconforming use may not be terminated *by a new zoning enactment*. In these situations, it is often said that the landowner had a 'vested right' in the use of the property before the use became nonconforming, and because the right was vested, the

---

[3] In addition to *Pinnacle I* and *Pinnacle II*, Plaintiffs also cite *Pinnacle Media, LLC v. Metropolitan Development Commission of Marion County*, 868 N.E.2d 894 (Ind. Ct. App. 2007) and *City of New Haven v. Flying J., Inc.*, 912 N.E.2d 420, 426 (Ind. Ct. App. 2009), each of which involves zoning ordinances.

18

government cannot terminate it without implicating the Due Process or Takings Clauses of the Fifth Amendment of the federal constitution, applicable to the states through the Fourteenth Amendment.") (emphasis added).  Because the Authorizing and Repeal Ordinances are not zoning ordinances and, as Plaintiffs concede, this is not a zoning case, and because no other legal authority has been cited that would establish a vested right in the elements of the Incentives, Plaintiffs have failed to plausibly allege that they had such a vested right in the Incentives.

### 2.  Mutual Understanding

Plaintiffs' final claim is that they have adequately alleged a property interest based on the parties' mutual understanding that the City would provide the Incentives.  A cognizable property interest can arise from "an expectation … that was legally enforceable, a mutually binding obligation."  *Common v. Williams*, 859 F.2d 467, 470 (7th Cir. 1998).  "However, a merely subjective and unilateral expectancy is *not* protected by due process."  *Davis v. City of Chicago*, 841 F.2d 186, 188 (7th Cir. 1988) (emphasis in original) (citation omitted).  Additionally, property interests arising from "mutually explicit understandings … cannot be based on the representations of government officials who are not authorized to make such representations," meaning that, to establish a property interest by mutual understanding, the plaintiff must "demonstrate that the person making statements had the authority to create a property interest …."  *Crull v. Sunderman*, 384 F.3d 453, 464, 465 (7th Cir. 2004) (quotations and citations omitted).

In the amended complaint, Plaintiffs allege that "[t]hroughout 2021, 2022, and 2023, the City vigorously pursued the Cedars project by promising the Incentives and by

19

engaging in multiple communications in person, on the phone and through email in which … the City's commitment to provide the Incentives" was conveyed and that "City officials—including Mayor Gentry and attorneys representing the City and its Council— repeatedly promised that the City would put the Incentives in place to induce RealtyLink into pouring its own resources into the Cedars project."  Am. Compl. ¶¶ 34–35.  These allegations regarding vague and conclusory promises made by the Mayor and other unnamed City officials fall short of the standard of plausibly alleging a cognizable property interest in the Incentives based on mutual understanding.

Under Indiana law, the authority to issue economic development financing assistance is provided under Indiana Code § 36-7-12-1 *et seq.*, which authorizes cities' fiscal bodies, not their mayors or other individual city officials, to issue bonds.  IND. CODE § 36-7-12-25(a)–(b); *see also Lartnec Inv. Co. v. Fort Wayne-Allen Co. Convention & Tourism Auth.*, 603 F. Supp. 1210, 1220 (N.D. Ind. 1985) ("[Section 36-7-12-1 *et seq.*] allows direct loans to developers, as well as issuance of notes, bonds or warrants to finance a project, *provided that the fiscal body which must approve the financing* finds [that the financing will benefit the municipality].") (emphasis added).  Because neither the Mayor nor any individual City official has the authority to bind the City to a promise or contract without the final approval of the Council, no property interest can be said to have arisen in the Incentives based on promises made by the Mayor and other unnamed city officials.

Nor are Plaintiffs' allegations regarding the issuance of the Authorizing Ordinance sufficient to plausibly allege a property right based on mutual understanding.  Although

the Authorizing Ordinance "authorized and directed" the "Mayor and the Clerk-Treasurer of the City…, in the name and on behalf of the City, to execute or endorse and deliver the Financing Documents [including the Bond Purchase Agreement], submitted to the Council, which are hereby approved in all respects," Dkt. 41-3, § 5, it further provided the Mayor and the Clerk-Treasurer discretion to negotiate and approve changes to the Financing Documents prior to execution, "such approval to be conclusively evidenced by their execution thereof." *Id.* § 6.  The Authorizing Ordinance specifically provided that "*after issuance of the Bonds* this Bond Ordinance shall not be repealed or amended in any respect which would adversely affect the rights of the holders of the Bonds as long as the Bonds or interest thereon remains unpaid."  Dkt. 41-3 at 4 (emphasis added). Accordingly, the terms of the Authorizing Ordinance were clear: that, until the Bonds were issued, the Council retained the discretion to repeal its authorization.  Here, Plaintiffs concede that the Council repealed the Authorizing Ordinance before the Bonds were issued.  Under these circumstances, Plaintiffs' allegations do not support a plausible inference that the Authorizing Ordinance created a cognizable property interest in the Incentives based on mutual understanding.

### III.   Equal Protection Claim

Plaintiffs allege in Count II that, in passing the Repeal Ordinance, Defendants singled them out for disparate treatment without a rational basis, in violation of the Fourteenth Amendment's Equal Protection Clause.  Defendants rejoin that Plaintiffs pled themselves out of court by providing several legitimate reasons for the Repeal Ordinance, thereby defeating Plaintiffs' "class-of-one" equal protection claim.

21

Under the Fourteenth Amendment's Equal Protection Clause, a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1, cl. 4.  This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation omitted).  In addition to protecting against class-based discrimination, the Equal Protection Clause also "protect[s] individuals against purely arbitrary government classifications, even when a classification consists of singling out just one person for different treatment for arbitrary and irrational purposes." *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012).  To state such a "class of one" equal protection claim, a plaintiff must show, at a minimum,[4] that he was "intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citations omitted).  At the pleading stage, "plaintiffs alleging class-of-one equal protection claims do need not to identify specific examples of similarly situated persons in their complaints." *Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015) (citation and quotation marks omitted).

---

[4] The Seventh Circuit has recognized that, "[s]ince the Supreme Court's decision in [*Village v. Willowbrook v.*] *Olech*, [528 U.S. 562 (2000)], our cases have struggled with the question whether proof of illegitimate animus is also required; the extent to which the subjective motivations of government officials affect the analysis remains unclear." *Greenwald Family Ltd. P'ship v. Mukwonago*, 100 F.4th 814, 823 (7th Cir. 2024) (citation omitted).  Because we find that Plaintiffs' claim fails regardless of any possible personal animus, we do not address this issue further.

When courts review municipal legislation, "rational basis review requires [them] to presume an ordinance is valid and to uphold it so long as it bears a rational relation to some legitimate end." *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013 ) (quotation marks and citation omitted).  "The burden is on the [equal-protection] challenger 'to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.'"  *D.B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) (quoting *Srail v. Village of Lisle, Ill.*, 588 F.3d 940, 946–47 (7th Cir. 2009)).  "Indeed, the proffered rational basis need not be the *actual* justification; rather, 'any reasonably conceivable state of facts that could provide a rational basis will suffice.'"  *Greenwald Family Ltd. P'ship v. Mukwonago*, 100 F.4th 814, 823 (7th Cir. 2024) (quoting *145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 771 (7th Cir. 2021)).

A "perplexing situation," therefore "arises when a lawsuit challenging a government action subject only to rational basis review is evaluated under the deferential standard of a Rule 12(b)(6) motion to dismiss."  *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 546 (7th Cir. 2008) (citation omitted).  To survive a Rule 12(b)(6) motion, a class-of-one plaintiff "must allege facts sufficient to overcome the presumption of rationality that applies to government classifications."  *Id.*  Accordingly, "it is possible for plaintiffs to plead themselves out of court if their complaint reveals a potential rational basis for the actions of local officials."  *Miller*, 784 F.3d at 1121 (citing *Kopp*, 725 F.3d at 686).

Because "a given action can have a rational basis and be a perfectly logical action for a government entity to take even if there are facts casting it as one taken out of

animosity," *Flying J*, 549 F.3d at 547, the "proper question" in assessing whether a complaint adequately alleges a class-of-one equal protection claim is whether "the complaint reveal[s] a rational basis for [the differential treatment] *notwithstanding* [any alleged bad motive]." *Kopp*, 725 F.3d at 686 (emphasis in original).

Plaintiffs' amended complaint reveals potential rational bases that justified the City's adoption of the Repeal Ordinance. Plaintiffs allege, for example, that there is a known water shortage in the City; that the City had no connection for utilities on the Property, such that Plaintiffs were required to obtain easements from neighboring property owners, which process took multiple years; and that, in repealing the Incentives for the Property but continuing to support other land development projects, the City "diverted water that would be available to the Cedars [Project] in order to supply it to the LEAP district." Dkt. 41 ¶ 226; *see also* Dkt. 17-4 at 26 (noting that among the concerns for repealing the Authorizing Ordinance was the "overall [C]ity water concern"). Assuming this to be true, the City prioritizing the allocation of water to certain projects over others, particularly projects not facing similar utility connection hurdles to those alleged to have been encountered at the Property, is not irrational. *See Greenwald*, 100 F.4th at 824 (finding a rational basis for selecting one developer over another because the plaintiff's "preferred route lacked infrastructure like utility access and a sewage system").

Accordingly, because Plaintiffs' allegations provide a conceivable rational basis for repealing the Incentives, they have pled themselves out of court on their class-of-one equal protection claim.

**IV. Section 1983 Claim**

"Section 1983 is not itself a source of substantive rights; instead it is a means for vindicating federal rights conferred elsewhere." *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997). Because we have found, for the reasons detailed above, that Plaintiffs have failed to adequately allege their Fourteenth Amendment due process and equal protection claims, there is nothing to hold Defendants liable for and thus no basis for a standalone Section 1983 claim.

### V.    State Law Claims

Here, Plaintiffs allege that we have subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 "because this complaint asserts claims arising under the laws of the United States," and that we have "supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because the state law claims arise out of the same set of operative facts as the claims arising under federal law." Am. Compl. ¶¶ 14, 15. Plaintiffs do not allege that diversity jurisdiction exists.

Having dismissed Plaintiffs' federal claims over which we have original jurisdiction, the Court retains only supplemental jurisdiction over the remaining claims. A district court "may decline to exercise supplemental jurisdiction" over a state law claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Ratfield v. United States Drug Testing Lab'ys, Inc.*, 140 F.4th 849, 854 (7th Cir. 2025) (citation omitted). "[O]nly in 'unusual cases' may a district court exercise its discretion to assert its supplemental jurisdiction based upon the

25

balance of the factors of 'judicial economy, convenience, fairness and comity.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015) (quoting *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994)).

The case at bar is not an unusual case requiring the departure from the usual practice. The Court has not yet invested significant resources into resolving the state law claims or engaged in any meaningful review of their merits. We are aware of no reason that it would be any less convenient or fair for the parties to proceed in state rather than in federal court. For these reasons, we decline to exercise supplemental jurisdiction and dismiss the remaining claims without prejudice.

## VI.    Conclusion

For the foregoing reasons, the Defendants' Motion to Dismiss [Dkt. 47] is GRANTED without prejudice. If Plaintiffs seek to amend their complaint in an effort to overcome the deficiencies identified in this order, they must file an amended pleading within forty (40) days from the date of this Order. If Plaintiffs fail to file a second amended complaint within the forty days allowed, final judgment will be entered.

IT IS SO ORDERED.

Date: _____6/10/2026_____          _____*Sarah Evans Barker*_____

                                              SARAH EVANS BARKER, JUDGE
                                              United States District Court
                                              Southern District of Indiana

26

Distribution:

Mark Jason Crandley
BARNES & THORNBURG, LLP (Indianapolis)
mcrandley@btlaw.com

Daniel R. Kelley
DINSMORE & SHOHL LLP (Indianapolis)
daniel.kelley@dinsmore.com

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP (New Albany)
jlowe@k-glaw.com

Tyler Jackson Mitchell
Dinsmore & Shohl
tyler.mitchell@dinsmore.com

Charlie Rice
Barnes & Thornburg LLP
crice@btlaw.com